**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- X

TOR EKELAND,

                              Plaintiff,

     v.

NEW YORK CITY POLICE ("NYPD") DETECTIVE
PELOCKA Y. BINNS, in her individual capacity;
NYPD DETECTIVE EDWIN EXILHOMME, in his
individual capacity;

                              Defendants.

---------------------------------------------------------------------- X

**COMPLAINT**

JURY TRIAL DEMANDED

Case No. 22-cv-3485

Plaintiff TOR EKELAND, by and through his attorneys, Hamilton Clarke, LLP, alleges as follows:

## **PRELIMINARY STATEMENT**

1. Plaintiff Tor Ekeland brings this civil rights action because his constitutional and civil rights were violated when New York City Police Department detectives arrested him without legal justification for disciplining his thirteen-year-old son by depriving him of the privilege to use a video game laptop as a disciplinary measure for his son's refusal to prioritize completing his schoolwork.

2. The NYPD's assault on parental rights in this instance violates both the United States and New York State Constitutions, and, moreover, shocks the moral and societal conscience where a parent can actually be arrested for removing a video gaming device from a teenaged child as punishment if that child or an adult on behalf of that child decides to call the police and make a report about it.

3. Mr. Ekeland, as a joint legal custodial parent of his son had the legal and

constitutional right to discipline his son in such a matter so as to benefit his son's well-being. Subsequently and inexplicably, however, the Defendants caused and effected Mr. Ekeland's arrest for said disciplinary action which forced him – a New York State licensed attorney in good standing and an officer of this Court – to have to spend close to twenty-six (26) hours in a Brooklyn central booking jail cell in the middle of an historic pandemic.

4. Ultimately, the matter was dismissed in Mr. Ekeland's favor via speedy trial grounds by the Brooklyn District Attorney's office.

5. Mr. Ekeland brings this suit to vindicate his civil and constitutional rights and to hold the NYPD detectives accountable for their actions. He seeks, among other things, compensatory damages for his injuries and punitive damages to ensure that the detecives' misconduct is punished and will not happen again.

## JURISDICTION AND VENUE

6. This action is brought pursuant to 42 U.S.C. § 1983 for violations of plaintiff's civil rights secured by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

7. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8. Venue is proper pursuant to 28 U.S.C. § 1391 in the Eastern District of New York, which is the judicial district where the events giving rise to this action took place.

## JURY DEMAND

9. Plaintiff demands a trial by jury in this action on each of his claims for which a jury trial is legally available.

## THE PARTIES

10. Plaintiff TOR EKELAND is a citizen of the United States and of the State of

NewYork.  At all times relevant to this complaint, he resided in the State of New York.

11. Upon information and belief, at all relevant times, defendants NYPD Detective Pelocka Y. Binns and NYPD Detective Edwin Exilhomme were and are citizens of the United States and the State of New York.

12. At all relevant times, the defendant officers were employed by the City of New York and acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of the NYPD and the City.

13. At all relevant times, the defendant officers violated plaintiff's clearly established rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution of which reasonable law enforcement officers in their respective circumstances would have known were violations of plaintiff's rights.

## STATEMENT OF FACTS

14. Tor Ekeland personally resides in Brooklyn, NY. He is a New York licensed attorney in good standing and is the Managing Partner of Tor Ekeland Law, PLLC, located at 30 Wall Street, 8th Floor, New York, NY 10005.

15. Mr. Ekeland has two minor biological children – a boy ("TE", 14-years old) and a girl ("SE", 16-years-old) – from his marriage to Ms. Stephanie Keith, who he is legally divorced from.

16. On November 18, 2020, after a nine-year separation, Mr. Ekeland and Ms. Keith entered their 66 page Stipulation of Settlement Agreement in their divorce case in New York State Supreme Court, Kings County.

17. Under the terms of their divorce decree, Mr. Ekeland and Ms. Keith share joint legal and physical custody of both children, alternating custody between households weekly.

18. Currently, TE lives full time with Mr. Ekeland and does not want to return to his mother's home. Mr. Ekeland is seeking full custody of TE, at TE's request, in a separate proceeding.

19. On or about January 5th, 2021, Ms. Keith, a professional photojournalist, went to cover what turned into the January 6th Insurrection after a last minute hire by a New York City media outlet. Despite having responsibility for the children under the divorce decree for that week, she left TE unattended and did not inform Mr. Ekeland as she left for Washington D.C.

20. SE informed Mr. Ekeland of the fact that Ms. Keith left TE unattended, and Mr. Ekeland immediately had TE come to his apartment in downtown Brooklyn.

21. On January 6, 2021, despite his busy work schedule, Mr. Ekeland took TE to Mr. Ekeland's nearby office where TE logged into virtual school on a video gaming laptop purchased in part with Mr. Ekeland's financial resources.

22. While at Mr. Ekeland's office, TE worked on his homework alongside his father.

23. At the time, TE was struggling with his grades, for which Mr. Ekeland was spending close to $7,000 on tutors, as well as spending substantial time with his son to help him with school.

24. Later that morning of January 6, 2021, Mr. Ekeland learned that TE hadn't been honest with Mr. Ekeland about turning in his assignments. In response, Mr. Ekeland took the video gaming laptop that TE used for his schoolwork and disabled the hard drive by physically breaking it.

25. Mr. Ekeland then discussed the importance of TE being honest with him and

doing his schoolwork if he expects to have the privileges of using video game laptops, et al, that were purchased in part with Mr. Ekeland's financial resources.

26. Mr. Ekeland then gave TE a standard, non-video-gaming laptop to do schoolwork from a cabinet where he keeps several in his office.

27. On or about January 18, 2021, Ms. Keith contacted the NYPD's 84th Precinct and informed Detective Binns that Mr. Ekeland had broken *TE's* laptop and headphones. (emphasis added)

28. Ms. Keith informed Detective Binns that Mr. Ekeland was TE's father.

29. Ms. Keith informed Detective Binns that TE was thirteen-years-old.

30. Upon information and belief, Ms. Keith informed Detective Binns that at the time the laptop and headphones were allegedly broken by Mr. Ekeland, TE was in the physical care and custody of Mr. Ekeland.

31. Upon information and belief, Ms. Keith *never* informed Detective Binns that TE had purchased the laptop with his own money or resources, because that would not have been true.

32. Upon information and belief, Detective Binns never inquired of Ms. Keith, TE, or anyone for that matter, as to who exactly purchased the video gaming laptop that TE was using in Mr. Ekeland's office.

33. Upon information and belief, Detective Binns never inquired of Ms. Keith, TE, or anyone for that matter, as to who exactly purchased the headphones that Mr. Ekeland allegedly broke.

34. Upon information and belief, Detective Binns never investigated whether TE could hold a true, legally recognized ownership interest in the video gaming laptop as against

Mr. Ekeland, or as against Mr. Ekeland's parental right to discipline TE by depriving him of nonessential property.

35. Upon information and belief, Detective Binns never investigated whether TE could hold a true, legally recognized ownership interest in the headphones that Mr. Ekeland allegedly broke as against Mr. Ekeland, or as against Mr. Ekeland's parental right to discipline TE by depriving him of nonessential property.

36. Detective Binns was deliberately and recklessly indifferent to the truth of whether TE could hold an ownership interest in the video gaming laptop and headphones as against Mr. Ekeland, or as against Mr. Ekeland's parental right to discipline TE by depriving him of nonessential property.

37. Based upon Ms. Keith's allegations alone, Detective Binns issued an NYPD I-Card stating that there was probable cause to call for Mr. Ekeland's arrest.

38. On or around March 1, 2021, Detective Binns contacted Mr. Ekeland to arrange for his surrender at the 84th Precinct.

39. Mr. Ekeland immediately retained counsel to communicate with Detective Binns.

40. On or around March 2, 2021, Detective Binns informed Mr. Ekeland's attorney that March 11, 2021 would be the best date for Mr. Ekeland to surrender.

41. Detective Binns likewise informed Mr. Ekeland's attorney that Mr. Ekeland was being arrested for violating New York Penal Law Section 145.00, Criminal Mischief in the Fourth Degree, stemming from his having allegedly broken *TE's* computer and headphones. (emphasis added)

42. On March 10, 2021, Mr. Ekeland's attorney emailed a letter ("the Letter") to

6

Detective Binns' NYPD email address invoking Mr. Ekeland's constitutional rights during any custodial interrogation and requesting the preservation of any and all discoverable materials related to Mr. Ekeland's arrest.

43. The Letter's second paragraph informed Detective Binns of the legal elements of Criminal Mischief in the Fourth Degree; specifically, that a person "is guilty of Criminal Mischief in the Fourth Degree when, *having no right to do so* nor any reasonable ground to believe that he or she has such right, he or she . . . [i]ntentionally damages property of *another person*; or [r]ecklessly damages property of *another person* in an amount exceeding two hundred dollars." (emphasis in original).

44. The Letter's second paragraph also informed Detective Binns that TE was a minor child – which, Ms. Keith had already corroborated for Detective Binns by informing Detective Binns that TE was only thirteen years old – and that, as such, TE did not have a property interest in the computer and headphones as against Mr. Ekeland.

45. The Letter's third paragraph informed Detective Binns that "The United States Supreme Court has held in principle, time and again, that parents have a constitutional right to manage 'the care, custody and control of their children.' *Troxel v. Granville*, 530 U.S. 57, 66 (2000)." And that "[t]hat principal constitutionally extends to matters of discipline, foundationally underpinning statutes such as New York Penal Law Section 35.10(1), which permits the use of physical force by a parent upon the body of their child 'to the extent that he reasonably believes it necessary to maintain discipline or to promote the welfare of such person.' Thus, to the extent that a parent may use physical force upon their children in New York to promote their welfare, certainly a parent has the right to remove their property from their children (and do with the property as they see fit) to promote their welfare."

7

46. The letter's third paragraph concluded with "Indeed, as the United States Supreme Court has also held, a 'child is not the mere creature of the State; those who nurture him and direct his destiny [i.e., his parents] have the right, coupled with the high duty, to recognize and prepare him for additional obligations,' without interference from the State. *Pierce v. Society of Sisters*, 269 U.S. 519, 515 (1925)."

47. Nevertheless, in the event that Detective Binns decided to move forward with arresting Mr. Ekeland even in the face of the Letter's ample notice that she didn't have probable cause to arrest him for Criminal Mischief in the Fourth Degree, the Letter's fifth paragraph made clear that "the NYPD is under no statutory duty pursuant to Criminal Procedure Law § 150.20 to process Mr. Ekeland for immediate arraignment in New York City Criminal Court[]" and that Detective Binns had the discretion to provide Mr. Ekeland with a Desk Appearance Ticket to keep him from having to spend time in the central booking jail waiting for his arraignment.

48. The Letter's sixth paragraph requested Detective Binns "to share [the] [L]etter with your supervisor(s) and/or NYPD Legal and get a determination from them as to whether you actually have probable cause in this instance."

49. Detective Binns never responded to the Letter in writing.

50. On the night of March 10, 2021, Detective Binns did not confirm with Mr. Ekeland's attorney that the surrender was still set for the morning of March 11, 2021.

51. Mr. Ekeland's attorney informed Detective Binns in writing that Mr. Ekeland would not surrender until confirmation was sent by Detective Binns that she still planned to arrest him in light of the Letter.

52. On or about March 11 or March 12 of 2021, Detective Binns informed Mr.

8

Ekeland's attorney that she still planned to arrest Mr. Ekeland and that March 16, 2021 worked best for Mr. Ekeland's surrender. During that conversation, Detective Binns acknowledged receipt of the Letter.

53. Under those circumstances, Mr. Ekeland's attorney requested that Detective Binns give Mr. Ekeland a Desk Appearance Ticket to save him from having to spend time in a central booking jail cell during the middle of the Covid-19 Pandemic and also to not take him away from his work as an attorney. Detective Binns refused to offer a Desk Appearance Ticket and informed Mr. Ekeland's attorney that Mr. Ekeland would have to go through the standard arraignment process.

54. Detective Binns informed Mr. Ekeland's attorney that she would have colleagues at the 84th Precinct process the arrest for her as she would not be at the 84th Precinct during the early morning hours of March 16, 2021.

55. On or about 8am on Tuesday, March 16, 2021, Mr. Ekeland surrendered himself to the NYPD's 84th Precinct in Brooklyn as arranged and coordinated by Detective Binns.

56. Upon arrival, acting on information and directives from Detective Binns, NYPD officers John Doe (1) and John Doe (2) placed handcuffs on Mr. Ekeland, patted him down, and searched his body and clothing.

57. He was then officially arrested for a single count of Criminal Mischief in the Fourth Degree in violation of New York Penal Law Section 145.00.

58. At or about 10am on Tuesday, March 16, 2021, the NYPD escorted Mr. Ekeland to central booking located at Kings County Criminal Court, 120 Schermerhorn Street, Brooklyn, NY.

59. At some time during the late evening hours of March 16, 2021, Detective Edwin Exilhomme signed a criminal complaint charging Mr. Ekeland with various violations of the New York Penal Law.

60. Upon information and belief, Detective Exilhomme signed said criminal complaint based upon discussion of the matter, in full, with Detective Pelocka, where she informed and directed Detective Exilhomme to arrest Mr. Ekeland for damaging *TE's* property. (emphasis added)

61. Specifically, under Kings County Criminal Docket No. CR-007164-21KN, Mr. Ekeland was charged via criminal complaint ("the criminal complaint") with Criminal Mischief in the Fourth Degree, Endangering the Welfare of a Child, and Harassment in the Second Degree, after Detective Exilhomme attested to being "INFORMED BY [TE] . . . THAT [TE] OBSERVED [MR. EKELAND] PICK UP [TE'S] LAPTOP, THROW IT ON THE GROUND, AND STOMP ON SAID LAPTOP WITH DEFENDANT'S SHOE."

62. "TE" never signed the criminal complaint or a criminal information.

63. Stephanie Keith never signed the criminal complaint or a criminal information.

64. Mr. Ekeland waited in a Brooklyn central booking jail cell for close to twenty-six (26) hours before finally being arraigned on the criminal complaint.

65. A substantial portion of the twenty-six (26) hours that Mr. Ekeland spent in a holding cell at Kings County Criminal Court included him being confined to a small, poorly ventilated room with close to one dozen other arrestees – their vaccine statuses unknown – in the middle of an historic pandemic.

66. On March 17, 2021, at or about 10am, Mr. Ekeland was arraigned by the Hon. Judge Maria Aragona, and released on his own recognizance.

67. At the time of his arraignment, Mr. Ekeland, a prominent New York City based federal criminal defense attorney and former associate at Sidley Austin, LLP had never been more humiliated in a courtroom, an arena where Mr. Ekeland is held in high regard.

68. Adding to that humiliation, on March 17, 2021, the New York Daily News published an article about Mr. Ekeland's arrest entitled "Lawyer for computer hackers arrested for throwing his son's computer to the ground and stomping on it", which is currently the fourth listed result if one – including a prospective legal client – Googles the name "Tor Ekeland" in the New York City Metropolitan area.

69. Mr. Ekeland's case remained open and on the public Web Crims docket until July 26, 2021, when it was dismissed and sealed in his favor by the Brooklyn District Attorney's Office.

70. Specifically, Mr. Ekeland's case was dismissed on speedy trial grounds because (i) the prosecution never converted the criminal complaint charging Mr. Ekeland with violations of the New York Penal Law to a criminal information within ninety (90) days of Mr. Ekeland's arraignment, as required by the New York Criminal Procedure Law; and (ii) the prosecution never filed a Certificate of Compliance with the Court – attesting to its completion of providing discovery to the defense – within ninety (90) days of Mr. Ekeland's arraignment, as required by the New York Criminal Procedure Law.

71. As a result of Mr. Ekeland's arrest and the ordeal that ensued, Mr. Ekeland has suffered, among other things, economic loss, the loss of his freedom, embarrassment, humiliation, fear, and the violation of his constitutional rights, which include his constitutional right to raise – and at times, legally discipline – his children without fear and worry of the state intervening and/or arresting him.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – False Arrest

72. Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

73. In committing the acts and omissions complained of herein, the individual defendants acted under color of state law, individually and in concert, to deprive plaintiff of his constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to, the right to be free from unreasonable seizures, the right to be free from arrest without probable cause, the right to be free from deprivation of liberty without due process of law, and the right to be free from detention and prosecution without probable cause.

74. In committing the acts and omissions complained of herein, the individual defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

75. As a direct and proximate result of the individual defendants' deprivation of plaintiff's constitutional rights, plaintiff suffered the injuries and damages set forth above.

76. The unlawful conduct of defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Malicious Prosecution

77. Plaintiff realleges and incorporates by reference the allegations set forth in theforegoing paragraphs as if fully set forth herein.

78. A criminal proceeding was initiated against Mr. Ekeland in Kings County Criminal Court.

79. The proceeding was initiated by the criminal complaint, signed by Detective Exilhomme, which included allegations that the defendants knew or in the absence of their deliberate indifference to the truth should have known did not amount to a criminal offense.

80. First, upon information and belief, the Defendants never even spoke to TE about the underlying facts of his purported ownership interest in the property allegedly broken by his father, nor did they investigate whether Mr. Ekeland had actually purchased said property for TE – which, in part, he had – because they were recklessly and deliberately indifferent to the truth.

81. Second, the Defendants (i) knew that TE was only thirteen years old; (ii) knew that TE was in his father's physical custody at the time the video gaming laptop and headphones were allegedly broken by Mr. Ekeland; and (iii) never put (i) and (ii) together to common-sensically and legally recognize that they did not have probable cause to arrest a father for breaking/removing property from his minor son while in his care and physical custody.

82. The criminal proceeding was terminated in Mr. Ekeland's favor when the case was dismissed on speedy trial grounds after the prosecution (i) failed to convert the criminal complaint to a criminal information within 90 days of Mr. Ekeland's arraignment as required by the New York Criminal Procedure Law; and (2) failed to file a Certificate of Compliance with the court attesting to providing the defense with discovery within 90 days of Mr. Ekeland's arraignment as required by the New York Criminal Procedure Law.

83. There was no probable cause for any of the charges brought against Mr. Ekeland.

84. The proceeding was brought out of actual malice and in order to cover up for the defendants' misconduct.

85. The defendant officers committed the foregoing acts intentionally, willfully, andwith malicious disregard for Mr. Ekeland's rights and are therefore liable for punitive damages.

86. As a direct and proximate result of the conduct of the defendant officers, Mr. Ekelandsuffered the injuries and damages set forth above.

## THIRD CAUSE OF ACTION
**Intentional Interference With Familial Relationship**

87. Plaintiff realleges and incorporates by reference the allegations set forth in theforegoing paragraphs as if fully set forth herein.

88. Defendants were aware that TE is Plaintiff's minor child.

89. Defendants were aware that TE was in the physical care and custody of Plaintiff at the time the property at issue was allegedly broken by Plaintiff.

90. Prior to arresting Plaintiff, Defendants were aware that Plaintiff removed the property at issue from TE's use as a disciplinary measure for TE not prioritizing his schoolwork.

91. Defendants were aware that Plaintiff removed the property at issue in the course of exercising Plaintiff's constitutional right to effectuate the ultimately well-being of TE, a child who Plaintiff loves and cares for deeply.

92. By arresting Plaintiff for the aforementioned discipline of his son, Defendants intentionally set out to interfere with the father/son relationship between Plaintiff and TE by stemming, chilling, and placing Plaintiff in fear from being able to exhibit love and care to TE in ways that are necessary to the ultimate well-being of TE – ways that include disciplining TE by removing property such as video game devices that are distracting TE from focusing on his schoolwork.

93. The unlawful conduct of Defendants was intentional, and was of such a nature that punitive damages should be imposed.

## DEMAND FOR RELIEF

**WHEREFORE**, plaintiff demands the following relief against the defendants, jointly and severally:

(a) compensatory damages in an amount just and reasonable and in conformity withthe evidence at trial;

(b) punitive damages from the individual defendants to the extent allowable by law;

(c) attorney's fees;

(d) the costs and disbursements of this action;

(e) interest; and

(f) such other and further relief as this Court deems just and proper.

Dated: New York, New York
June 13, 2022

Hamilton Clarke, LLP
48 Wall Street, Suite 1100
New York, New York 10005
(212)729-0952
PH@HamiltonClarkeLLP.com

By: _____
Phillip C. Hamilton, Esq.
Bar No. 4807095